(219 P.3d 831)
No. 100,593

STATE OF KANSAS, *Appellee*, v. MARTYE MADKINS, III, *Appellant*.

Opinion filed November 20, 2009.

*Randall L. Hodgkinson* and *Sean G. Whittmore*, legal intern, of Kansas Appellate Defender Office, for appellant.

*Tony Cruz*, assistant county attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, P.J., GREEN and STANDRIDGE, JJ.

STANDRIDGE, J.: Martye Madkins, III appeals his felony convictions for possession of cocaine and having no drug tax stamp. Madkins argues that the prosecutor's comments during closing argument indirectly referenced Madkins' failure to testify and suggested to the jury that Madkins had the burden of providing facts to prove his own innocence. Madkins further argues the district court improperly prohibited him from posing certain questions to prospective jurors during voir dire. For the reasons stated below, we affirm Madkins' convictions.

## FACTS

### The Arrest

On June 15, 2007, Junction City police officers arrested Kalvin Dotson, an alleged drug dealer, pursuant to a federal warrant. When the officers performed a stop of Dotson's car, Madkins was a passenger in the car. The officers reportedly observed Madkins throw a bag of crack cocaine out of the passenger's side window of the car. Madkins was subsequently arrested and charged with possession of cocaine with intent to sell and having no drug tax stamp.

### Voir Dire

Madkins' jury trial took place on November 28, 2007. During voir dire, the district court prohibited Madkins from posing certain questions to prospective jurors. Prior to the prohibition, Madkins' counsel had been exploring any ties or connections the prospective jurors had with police officers. The questioning briefly left the topic of police officers and focused on whether any of the prospective jurors worked with each other. Counsel then returned to the police officer topic by asking whether the prospective jurors could believe that a police officer might not tell the truth on the witness stand and whether they necessarily believed something happened just because a police officer said it happened. At this point, the judge interrupted questioning, ordered counsel to approach the bench, and prohibited defense counsel from asking any further questions about whether police officers lie.

### Evidence at Trial

At trial, the State provided several witnesses to the crime. The State's first witness was Angela New-Weeks, a Geary County sheriff's deputy. She testified to witnessing Madkins throw a bag of cocaine out the window of the stopped vehicle. The State provided the cocaine as an exhibit in the trial. Later, the State called Joshua Brown, a Junction City police officer, as a witness. Brown also testified to witnessing Madkins throw a bag of cocaine out of the vehicle. Another Junction City police officer, Randy Landreville, was called as a witness. Landreville testified to arriving late at the scene of the arrest and finding a bag of cocaine. The State also

called Brad Crow, a forensic scientist with the Kansas Bureau of Investigation. Crow testified that he ran a forensic test on the contents of the bag thrown by Madkins and determined that it contained cocaine. After the State rested its case, Madkins chose to rest his case and offered no evidence or witnesses.

Following jury deliberations, Madkins was convicted of possession of cocaine, the lesser-included crime of possession with intent to sell, and for having no drug tax stamp.

## ANALYSIS

### A. *Prosecutorial Misconduct*

Madkins alleges prosecutorial misconduct in closing argument when the prosecutor repeatedly asserted that there had been no testimony or evidence introduced at trial to refute the State's version of the facts. Our standard of review with regard to alleged misconduct by the prosecutor during opening statement or closing argument involves a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

In support of his claim of prosecutorial misconduct, Madkins alleges the prosecutor's comments regarding a lack of testimony or other evidence to refute the State's version of the facts (i) indirectly referenced Madkins' failure to testify; and (ii) suggested to the jury that Madkins had the burden of providing facts to prove his own innocence.

To that end, the prosecutor made the following comments during closing argument with regard to a lack of testimony or other evidence to refute the State's case. The prosecutor first mentioned a lack of evidence when he stated, "What you basically have, are two officers who were trying to arrest Kalvin Dotson for an outstanding federal warrant. You have no evidence to contradict that." Later, the prosecutor again noted a lack of evidence, stating, "And you've been provided absolutely no evidence today which would

lead you to believe that the officers had some type of motive to fabricate this story." This statement provoked an objection from Madkins' defense counsel, who stated, "I'm going to object to shifting the burden, defendant—no evidence—evidence presented to contradict and these sorts of things." The court attempted to clarify the issue by stating,

"All right. Let me just say, ladies and gentlemen of the jury, I'm going to tell you that the defendant, at no time, in a criminal case, has any burden of proof whatsoever to prove he's not guilty. And if there's any inference of that by the prosecutor, then you are to disregard that. That is not the law. All right?"

Notwithstanding the court's intervention, the prosecutor continued to make references to a lack of evidence by stating, "There's been no evidence to suggest that Mr. Dotson gave anything to Mr. Madkins." Next, the prosecutor argued, "There hasn't been any testimony or any evidence by the State's witnesses to suggest, you know, that somebody else happened to be there or, you know, there's some other logical explanation but for what the officers testified, and [that] the defendant threw out a bag of cocaine out the window." The prosecutor again made a statement regarding a lack of evidence when he said, "There has been absolutely no testimony except for—no evidence, except for the lack of baggies and scales, to contradict the State's evidence that the defendant possessed this with the intent to sell." Finally, the prosecutor told the jury, "You don't have anything to contradict these two officers' testimony."

### 1. Indirect References to Madkins' Failure to Testify

#### a. Step One: Were the Prosecutor's Comments Improper?

The Fifth Amendment to the United States Constitution, as well as § 10 of the Kansas Bill of Rights, forbid the prosecution from commenting directly or indirectly upon a defendant's silence. *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965); *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). An indirect comment violates the privilege against self-incrimination if it was "manifestly intended or was of such a character that the jury would necessarily take it to be a

comment on the failure of the accused to testify." *McKinney*, 272 Kan. at 347. In particular, a comment that the defense has not contradicted the State's evidence is impermissible if "it is highly unlikely that anyone other than the defendant could rebut the evidence." 272 Kan. at 347 (quoting *State v. DiCaro*, 852 F.2d 259, 263 [7th Cir. 1988]).

By pointing out that there had been no testimony presented at trial to contradict the officers' testimony or to provide any other logical explanation for the events as they transpired, we find the jury necessarily was led to believe that Madkins should have (and would have) taken the stand if he had something to say that would have contradicted the officers' testimony. Our finding in this regard relies on the fact that it was highly unlikely that any evidence other than Madkins' testimony could have rebutted the State's evidence. See *McKinney*, 272 Kan. at 347.

Specifically, the jury repeatedly was informed during opening statement, trial, and closing argument that the sole reason the undercover detectives stopped the car in which Madkins was riding as a passenger was to arrest Dotson, the driver of the car, pursuant to a federal warrant on charges of conspiracy to distribute cocaine. Madkins' theory of defense was that the cocaine found was not his, but was handed off to him by Dotson, who—as the jury repeatedly heard—was the target of a federal drug investigation involving distribution of cocaine. Given these facts, no reasonable juror would have expected Dotson to waive his right against self-incrimination by testifying that he handed the drugs off to Madkins. As a practical matter, then, the jury necessarily was led to believe the prosecutor's comments regarding a lack of testimony was a reference to Madkins—the only other individual present besides Dotson and the officers. See *McKinney*, 272 Kan. at 347 (comment that defense has not contradicted State's evidence is impermissible if "it is highly unlikely that anyone other than the defendant could rebut the evidence").

Based on the particular circumstances presented, we find the comments at issue were improper and outside the wide latitude that the prosecutor is allowed in discussing the evidence. Because we have found the prosecutor's comments during closing argument

were improper, we proceed to the second step of the analysis: whether Madkins was prejudiced as a result of the misconduct.

### b. Step Two: Did the Improper Comments Unfairly Prejudice Madkins?

In order to determine whether a defendant was prejudiced under the second step of the prosecutorial misconduct test, we consider the following three factors: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct demonstrates ill will by the prosecutor; and (3) whether the evidence of guilt is so overwhelming that the misconduct would likely have been given little, if any, weight in the minds of the jurors. *Albright*, 283 Kan. at 428. Evidence of ill will is reflected through deliberate and repeated misconduct or indifference to a court's rulings. *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 (2006). Likewise, in evaluating whether a comment was gross and flagrant, Kansas courts often consider whether the prosecutor repeated or emphasized the misconduct. See *State v. Miller*, 284 Kan. 682, 719-20, 163 P.3d 267 (2007) ("accumulation" of improper comments can be " 'gross and flagrant' ").

Based on the record before us, we find the prosecutor's repeated comments were improper and demonstrated an indifference to, not necessarily the court's rulings, but the court's actions. After making his second comment regarding a lack of evidence to refute the testimony of the police officers, Madkins objected. As a result, the court deemed it necessary to interrupt the State's closing argument to admonish the jury that "the defendant, at no time, in a criminal case, has any burden of proof whatsoever to prove he's not guilty. And if there's any inference of that by the prosecutor, then you are to disregard that. That is not the law." Notwithstanding the court's intervention in this regard, the prosecutor went on to make not just one, but four additional comments regarding the fact that no testimony or evidence had been introduced at trial to refute crucial aspects of the State's case. Given the deliberate and repetitive nature of the prosecutor's misconduct after the court indicated the argument was improper, we find the prosecutor's misconduct, at the very least, was flagrant.

With regard to the third factor, whether the evidence of guilt was overwhelming, we note the State presented various witnesses and evidence, all of which were consistent. Based on this fact, we find the evidence against Madkins was overwhelming. With that said, however, overwhelming evidence of guilt may not override flagrant conduct on behalf of the prosecutor unless the misconduct satisfies both the statutory and constitutional harmless error tests. *Albright*, 283 Kan. at 428.

The harmless error test of K.S.A. 60-261 requires this court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." "Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). Because Madkins alleges the prosecutorial misconduct at issue here impinged upon his right to invoke the Fifth Amendment privilege against self-incrimination, we apply the more stringent constitutional harmless error test set forth in *Chapman*.

When analyzing the prejudicial nature of the prosecutor's improper comments, we are required to examine the comments in the context of the trial record as a whole. See *State v. Warledo,* 286 Kan. 927, 948, 190 P.3d 937 (2008). Viewed in this context, we find beyond a reasonable doubt that there is no real possibility that the jury would have rendered a different verdict if the prosecutor had refrained from the misconduct. Regardless of whether the jury believed that Madkins would have testified if he had something to say that would have contradicted the officers' testimony, the reality is that even if the prosecutor had not made the comments at issue, the facts presented at trial would not have changed. In light of the facts presented at trial, there simply was no reasonable basis upon which the jury could have rendered a different verdict.

Based on the discussion above, we find the prosecutor's comments were improper and, given the repetitive nature of the misconduct after the court indicated the argument was improper, we further find the misconduct was at the very least flagrant. With that

said, however, we find beyond a reasonable doubt that there is no real possibility that the jury would have rendered a different verdict if the prosecutor had refrained from the misconduct. In other words, we find the prosecutor's comments did not prejudice Madkins or deny him a fair trial.

### 2. Improper Attempt to Shift the Burden of Proof

In his second argument in support of prosecutorial misconduct, Madkins alleges the prosecutor's comments regarding a lack of testimony or other evidence to refute the State's version of the facts suggested to the jury that Madkins had the burden of providing facts to prove his own innocence. Because we already have found beyond a reasonable doubt that there is no real possibility that the jury would have rendered a different verdict if the prosecutor had refrained from making the comments at issue, we find it unnecessary to reach this issue.

### B. Unconstitutional Limitation of Voir Dire

In his second point of error, Madkins argues that the district court deprived him of his Sixth Amendment right to a fair trial by an impartial jury when it prohibited him from asking prospective jurors during voir dire about their opinions concerning the reliability of police testimony. As noted above, the district court interrupted defense counsel during voir dire and requested both counsel approach the bench. During the bench conference, the judge informed defense counsel that, while counsel may explore the issue when cross-examining the officers, counsel could not question the prospective jurors any further about any notions they may have about police credibility. Madkins argues this ruling violates the Sixth Amendment.

The right to a trial by an impartial jury is a basic guarantee of both the United States and Kansas Constitutions. U.S. Const. amend. VI, XIV; Kan. Const. Bill of Rights, § 10. This right to an impartial jury includes the opportunity to conduct "an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729, 119 L. Ed. 2d 492, 112 S. Ct. 2222, (1992). " 'Voir dire is the examination and interrogation of prospective jurors; its pur-

pose is to assist counsel in challenging jurors for cause, so that a competent, fair, impartial and unprejudiced jury may be seated. [Citation omitted.]' [Citation omitted.]" *Westboro Baptist Church, Inc. v. Patton*, 32 Kan. App. 2d 941, 948, 93 P.3d 718, *rev. denied* 278 Kan. 852 (2004).

With regard to conducting voir dire, K.S.A. 22-3408(3) provides:

"The prosecuting attorney and the defendant or his [or her] attorney shall conduct the examination of prospective jurors. The court may conduct an additional examination. The court may limit the examination by the defendant, his [or her] attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose."

K.S.A. 22-3410(2)(i) further provides that a juror may be challenged for cause if "[h]is [or her] state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he [or she] can act impartially and without prejudice to the substantial rights of any party."

It goes without saying that the particular facts of a case, the parties involved, and the witnesses who will be testifying at trial greatly determine the issues that may be appropriately explored during voir dire to ensure that fair, impartial, and unprejudiced jurors are impaneled. The United States Supreme Court has acknowledged this reality by stating that "[t]he Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729. Furthermore, our Supreme Court has stated that "[t]he appropriate scope and extent of voir dire may vary greatly from case to case and therefore is not governed by any fixed rules." *State v. Hayes*, 258 Kan. 629, 631, 908 P.2d 597 (1995). Thus, the particular circumstances surrounding a case will largely determine whether a district court erred when it prevented a defendant from exploring a certain issue during voir dire.

This was particularly true in *Ham v. South Carolina*, 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848 (1973), a case where the United States Supreme Court had to determine whether the trial court erred when it refused to ask prospective jurors during voir dire about any possible prejudices they may have against African-Americans. Ham, a young black man who had worked in local civil rights

organizations, was charged with possession of marijuana. His basic defense at trial was that law enforcement officers had framed him on the drug charges because of his civil rights activities.

In holding that the district court erred when it refused to ask prospective jurors about prejudices they may have with regard to race, the Supreme Court stated:

"South Carolina law permits challenges for cause, and authorizes the trial judge to conduct *voir dire* examination of potential jurors. The State having created this statutory framework for the selection of juries, the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias." 409 U.S. at 527.

Thus, the Supreme Court reversed Ham's conviction. 409 U.S. at 529.

The Supreme Court's decision to reverse a criminal conviction due to inadequate voir dire has not been limited to only cases where the defendant was prevented from asking prospective jurors about racial prejudice. In *Morford v. United States*, 339 U.S. 258, 258-59, 94 L. Ed. 815, 70 S. Ct. 586 (1950), the defendant was charged with refusing to produce before the House Committee on Un-American Activities the records of the National Council for American-Soviet Friendship, Inc. See *Morford v. United States*, 176 F.2d 54, 56 (D.C. Cir. 1949). During voir dire, the trial court did not allow defense counsel to ask prospective, government employee jurors whether the Loyalty Order (an attempt by our government during the Red Scare of the 1940's and 1950's to ensure that all persons entering federal employment and current federal employees were loyal to the government) would have any influence on their ability to serve as impartial jurors. 339 U.S. at 259. See also *Dennis v. United States*, 339 U.S. 162, 169, 94 L. Ed. 734, 70 S. Ct. 519 (1950).

On appeal, the *Morford* Court noted that such questioning was allowed by the trial court during voir dire in *Dennis*, 339 U.S. at 171 n.4, and was used by the Supreme Court in that case to further justify its decision to affirm Dennis' conviction (Dennis argued on appeal that the federal employees who served on his jury should have been automatically stricken for cause, 339 U.S. at 164). After

noting the *Dennis* decision, the *Morford* Court stated the opportunity to prove actual bias in potential jurors during voir dire is a guarantee contained in the right to an impartial jury. Because the trial court prevented defense counsel from asking prospective jurors questions about the Loyalty Order's influence on them (an issue of particular importance given the circumstances of the case), the Supreme Court held the defendant was denied the opportunity to prove actual bias, and thus, reversed the defendant's convictions. 339 U.S. at 259; see also *Aldridge v. United States*, 283 U.S. 308, 313, 75 L. Ed. 1054, 51 S. Ct. 470 (1931) ("The right to examine jurors on the *voir dire* as to the existence of a disqualifying state of mind, has been upheld with respect to other races than the black race, and in relation to religious and *other prejudices of a serious character*." [Emphasis added.]).

Though the Supreme Court has reversed convictions based on inadequate voir dire, it also has recognized that the manner in which voir dire is conducted is a matter of discretion better left to the trial court. See *Morgan*, 504 U.S. at 729. Kansas appellate courts also recognize this general rule. *E.g.*, *State v. Neighbors*, 21 Kan. App. 2d 824, 830, 908 P.2d 649 (1995) ("The extent of the examination of jurors during voir dire is within the discretion of the trial court. The appellate courts will not interfere unless an abuse of discretion is clearly shown."). However, a review for abuse of discretion includes a review to determine whether erroneous legal conclusions guided the exercise of that discretion. *State v. Skolaut*, 286 Kan. 219, Syl. ¶ 3, 182 P.3d 1231 (2008). As our Supreme Court has stated, "even abuse of discretion standards can sometimes more accurately be characterized as questions of law requiring de novo review." *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005). More specifically, the court explained:

" ' "Little turns, however, on whether we label review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by *erroneous legal conclusions*." ' (Emphasis added.) 279 Kan. at 332 (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996])." *Skolaut*, 286 Kan. at 225.

Based on this precedent, we acknowledge the scope of juror examination during voir dire is within the discretion of the trial court, but will review de novo the district court's ultimate decision to prohibit the questions to determine whether that decision was guided by erroneous legal conclusions.

A review of Kansas decisions reveals that no Kansas appellate court has addressed the precise issue presented: whether prohibiting voir dire questions regarding prospective juror opinion on police credibility violates a defendant's constitutional right to trial by an impartial jury.

In order to determine whether such a prohibition impinged upon Madkins' constitutional rights in this case, we found it helpful to review decisions from other jurisdictions that have addressed the issue. Although this review demonstrated that there is no unified consensus on the ultimate issue of restricting voir dire questions regarding police officer credibility, we have distilled from these cases several relevant factors to help us determine whether such restrictions on questioning impinges upon the constitutional rights of a particular defendant.

First, a majority of the courts addressing the issue considered the extent to which police officer credibility was at issue in the case to determine whether restriction on voir dire questions about police credibility violates a defendant's right to trial by an impartial jury. See *United States v. Anagnos*, 853 F.2d 1, 2 (1st Cir. 1988); *State v. Dolphin*, 203 Conn. 506, 525 A.2d 509 (1987); *People v. Arce*, 289 Ill. App. 3d 521, 527-28, 683 N.E.2d 502 (1997), *vacated on other grounds People v. Arce*, 174 Ill. 2d 569, 685 N.E.2d 623 (1997); *State v. Dyer*, 682 So. 2d 278, 280 (La. App. 1996); *Langley v. State*, 281 Md. 337, 349, 378 A.2d 1338 (1977); *Commonwealth v. Gittens*, 55 Mass. App. Ct. 148, 151 n.3, 769 N.E.2d 777 (2002); *State v. Oates*, 246 N.J. Super. 261, 267, 587 A.2d 298 (1991); *Mullis v. Commonwealth*, 3 Va. App. 564, 571, 351 S.E.2d 919 (1987); *State v. Wilson*, 157 W. Va. 1036, 207 S.E.2d 174 (1974).

Second, some courts considered whether the prohibited inquiry is cumulative; in other words, whether counsel already had been given an adequate opportunity to ask voir dire questions directed at discovering bias in favor of police officers. See *Paine v. City of*

*Lompoc*, 160 F.3d 562, 565 (9th Cir. 1998); *Anagnos*, 853 F.2d at 2; *United States v. Espinosa*, 771 F.2d 1382 (10th Cir. 1985); *Dyer*, 682 So. 2d at 280; *State v. Greer*, 635 N.W.2d 82 (Minn. 2001).

Third, there were courts that examined whether police officer testimony would be corroborated by other, nonpolice witnesses. See *City of Lompoc*, 160 F.3d at 565; *Anagnos*, 853 F.2d at 2; *Langley*, 281 Md. at 349; *Oates*, 246 N.J. Super. at 267.

And, finally, there was one court that examined whether the trial judge explicitly informed the jury not to give deference to officer's testimony in order to determine whether restriction on voir dire questions about police credibility violates a defendant's right to trial by an impartial jury. *City of Lompoc*, 160 F.3d at 565. Notably, however, another court found examination of this factor was an invalid substitute for proper voir dire questioning before trial. See *Jenkins v. United States*, 541 A.2d 1269, 1270 (D.C. App. 1988).

With regard to the fourth and final factor, we agree with the conclusion reached by the court in *Jenkins* that an instruction to the jury *during* trial that admonishes them to objectively consider the evidence is an invalid substitute for proper voir dire questioning *before* trial regarding personal bias. Thus, we utilize only the first three factors set forth above to determine whether the district court's decision to restrict voir dire questions about police credibility violated Madkins' right to trial by an impartial jury.

With regard to the first factor, there is no dispute that the credibility of police officer testimony was central to the State's case against Madkins. In order for the State to convict Madkins of possession of cocaine and having no drug tax stamp, the jury had to accept as true the officers' testimony that Madkins threw a bag of cocaine from the car. And, with regard to the third factor, the police officer testimony in this case was not corroborated by other, nonpolice witnesses.

Although consideration of the second factor requires a bit more analysis, we ultimately conclude the prospective jurors' general notions about police officer credibility were sufficiently explored during voir dire. Upon review of the record, we note that there were multiple voir dire questions posed regarding a prospective juror's personal experience or personal relationship with a police officer.

Several prospective jurors answered affirmatively and a follow-up question was posed regarding whether the personal experience or relationship would prevent the jurors from being impartial in this case. All jurors responded that they could be impartial.

After briefly leaving the topic to ask whether any of the jurors worked with each other, defense counsel returned to the police officer topic. The relevant portion of the voir dire transcript reads as follows:

"[Defense Counsel Steve Staker:] Does anyone here believe, or would anyone here find it hard to believe that a police officer would not tell the truth on the stand? Anybody find that hard to believe? *Okay.* Does anyone believe that if we had police officers that take the stand and testify, that something happened, that it must have happened?

"The Court: Mr. Staker, Mr. Cruz, please approach. . . . Mr. Staker, if that's your defense, you have the right to cross-examine and challenge the witnesses. And I understand what you're doing, but I'm not going to let you ask questions about whether officers lie. If you're going to establish that in cross-examination, more power to you. But let's get off it.

"Mr. Staker: I think there would be corroborating evidence that will contradict the officers' claims.

"The Court: Oh. There doesn't have to be corroborating evidence. Let's get off it. I'm not going to allow it. Okay? Understand? Okay. Thank you." (Emphasis added.)

Notably, the beginning of the excerpt cited above reflects a question by defense counsel regarding general police credibility, which is immediately followed by the word "okay." When put in context, we believe counsel's use of the word "okay" acknowledges—for purposes of the record—a lack of juror response to his question regarding police credibility. Our belief is supported by the transcript of voir dire in its entirety.

Voir dire began with questioning by the court, after which the prosecutor was given an opportunity to ask questions. After the prosecutor was done, defense counsel was given an opportunity to pose questions. The transcript of defense counsel's interaction with the jury during voir dire spans approximately 17 pages. In those 17 pages, defense counsel used the word "okay" approximately 43 times. In each case, defense counsel used the word to acknowledge

either an affirmative response to his question by a juror or to acknowledge the lack of response by any juror to his question.

In the excerpt set forth above, the word "okay" is not preceded by a juror response; thus, we must conclude that defense counsel said "okay" in order to acknowledge the lack of any juror response to his question. Defense counsel then asked a follow-up question that rephrased the original question. It is only after this follow-up question that the district court interrupted and prohibited further interrogation on the police credibility issue.

Based on this record, we find the prohibited inquiry was cumulative and provided no additional benefit in discovering whether any of the potential jurors held a general bias in favor of police officer testimony. Accordingly, we conclude the district court's decision to prohibit further voir dire questions regarding prospective juror opinion on police credibility did not violate Madkins' constitutional right to trial by an impartial jury and did not constitute an abuse of discretion.

Affirmed.